# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:17-cv-0070

JAMES KEVIN YOST, TDCJ #01333468, PETITIONER,

v.

LORIE DAVIS, RESPONDENT.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, UNITED STATES DISTRICT JUDGE.

State inmate James Kevin Yost, who proceeds *pro se*, is incarcerated in the Texas Department of Criminal Justice–Correctional Institutions Division ("TDCJ"). Yost has filed a petition for a federal writ of habeas corpus (Dkt. 1, Dkt. 10) and a supporting memorandum (Dkt. 11), seeking relief from a state-court conviction. Respondent Lorie Davis filed an answer (Dkt. 22) and a copy of the state-court records (Dkt. 23, Dkt. 24). Yost has responded (Dkt. 36, Dkt. 41), and his claims are ripe for decision. Having now considered the petition, briefing, all matters of record, and the applicable legal authorities, the court determines that the petition should be dismissed for the reasons that follow.

# I.  BACKGROUND

## A.  Procedural Background

In 2005, Yost was convicted of murder by a jury in the 23rd District Court for Brazoria County, Hon. Patrick Sebesta presiding, Case No. 46412. The jury sentenced Yost to life imprisonment. *See* Dkt. 23-6, at 69-72.[1] On April 24, 2007, the Fourteenth Court of Appeals affirmed the judgment against him. *Yost v. State*, 222 S.W.3d 865 (Tex. App.–Hou. [14th Dist.] 2007, pet. dism'd). The Texas Court of Criminal Appeals dismissed Yost's petition for discretionary review on August 22, 2007. *See id.*

On July 12, 2016, Yost executed an application for state habeas relief (Dkt. 24-15, at 11-34) (WR-85,810-01). The trial court entered findings of fact and conclusions of law recommending denial of relief (Dkt. 24-18, at 96-98; Dkt. 24-19, at 1-3). On February 15, 2017, the Court of Criminal Appeals denied the application without written order on the trial court's findings without a hearing (Dkt. 24-25).

Approximately two weeks later, on February 28, 2017, Yost executed a petition for writ of habeas corpus in these federal proceedings (Dkt. 1).

## B.  Factual Background

Yost was convicted of the murder of his 12-year-old stepdaughter, Anna

---

[1]  Throughout this memorandum opinion, the court's citations to specific pages in the record refer to the pagination of docket entries on the court's electronic case-filing ("ECF") system.

Farmer.  The appellate court summarized some of the facts presented at trial as follows:

> At about 3:00 a.m. on December 29, 2003, police and emergency medical personnel arrived at appellant's residence in response to a 911 call for assistance with a sick child. At the home, they discovered twelve-year-old Anna Farmer's body on the floor by her bed. Her body was cold, and rigor mortis had already begun to set in. Bridget Farmer, Anna's mother and appellant's common-law wife, testified to the events leading up to Anna's death.

> According to Bridget, appellant had a history of isolating and abusing Anna. He kept Anna locked in her bedroom, and she was not allowed to speak to her siblings. He even forbade Anna's mother from speaking to her. At appellant's orders, Anna did not attend school, but spent her days accompanying him to his work tending a booth at a flea market or copying verses from the Bible. At times appellant would not allow her to use the restroom, telling her to use her bedroom instead. According to Bridget, appellant punished Anna by forcing her to take cold showers or beating her. In one such episode, he paddled her with a board so hard that Anna's skin split and bled. In another instance, he struck Anna's head with such force that she had swelling and black eyes for over a week. After both of these incidents, appellant told Bridget that he had lost his temper because Anna "fought" him. Bridget further testified that appellant would not allow her to seek medical treatment for Anna after these beatings. Moreover, she stated, appellant threatened to kill Anna if Bridget left him.

> Bridget also supplied all of the testimony regarding events that occurred on December 28 and the early hours of December 29, 2003. According to Bridget, Anna accompanied appellant to his booth on the morning of December 28. Sometime around midday, appellant called Bridget and told her to come to the flea market so he could go to another booth to pay rent. Bridget stayed with Anna while appellant paid the rent, and when he returned, Bridget took Anna to the restroom. Anna complained that her stomach hurt, and Bridget took Anna home and sent her to her room. Bridget testified that a short while later, she checked on Anna, and Anna said that she had thrown up, but had cleaned it up. Bridget testified that she gave Anna some juice and told her to lie down.

> According to Bridget, appellant arrived home at approximately 5:00

p.m., turned on the heater, and went into Anna's room. Although the air conditioning and heating unit muffled the sound, Bridget heard three bumps against Anna's wall, and heard Anna say, "Ouch." Bridget testified that a short time later, appellant came out of Anna's room looking scared and told Bridget that Anna was not breathing. According to Bridget, "[appellant said] it wasn't something he just did. It must have been something he did the day before."

Bridget said she attempted CPR, but was unsuccessful. She further testified that appellant asked her to help him dispose of Anna's body, but she refused. According to Bridget, she told appellant she wanted to call 911, but appellant did not allow her to do so, and told her that if she did call, they would both go to prison. Bridget testified that appellant then gathered some of his belongings, the title to his truck, the telephones, the fax receiver, and the keys to both vehicles. He instructed Bridget to wait until the next day before calling 911 to give him a "head start," and left at around 9:00 p.m. Several hours later, Bridget found an old phone, called her aunt, and left a message for her mother. After her mother returned her call, Bridget finally called 911. It was then approximately 3:00 a.m. on December 29, 2003. According to Bridget's testimony, Anna had been dead approximately eight hours by the time police and other emergency personnel arrived.

At appellant's trial, Texas Ranger Richard Shing testified that appellant was apprehended at a Dallas motel on January 1, 2004. Evidence collected from the motel showed that appellant had registered using a false name and address on December 30, 2003. Shing testified that there was a "for sale" sign on appellant's truck in the motel parking lot.

Appellant was returned to Brazoria County and charged with murder; Bridget was charged with two counts of injury to a child by failing to provide Anna with proper nourishment and medical care. As part of a plea agreement, Bridget pleaded guilty to both counts, received ten years of probation for each count, and agreed to relinquish her parental rights to her three remaining children. She also agreed to testify against appellant.

Like Bridget, Anna's younger half-sister P.W. testified that appellant routinely isolated Anna from the rest of the family. According to P.W., appellant kept Anna locked in her bedroom while Bridget, P.W., and appellant's two small children slept in the living room of the trailer. While the rest of the family ate together, appellant forced Anna to eat

standing at the counter. She was allowed only five minutes to eat, and when at home, she was usually allowed to eat only sardines, beets, and kidney beans. P.W. further testified that sometimes when appellant and Anna were in Anna's bedroom, she heard banging sounds coming from the room. P.W. related that she heard appellant tell Bridget weekly or even daily that he would kill Anna someday. P.W. also described how appellant forced Anna to copy Bible verses all day, and testified that he monitored Anna on a surveillance camera installed in her bedroom. According to P.W., appellant frequently referred to Anna using various slurs, calling her a "wetback" and a "bitch." P.W. testified that appellant let Anna sit at the table at Christmas that year, but because P.W. left to visit her biological father on December 26, she could not testify to events after that time.

Medical examiner Stephen Pustilnik testified that, at the time of her death, Anna was underweight, extremely malnourished, and chronically dehydrated. He also testified at length regarding Anna's many internal and external injuries, bruises, and scars, and pointed out the symptoms and effects of Anna's prolonged starvation. He opined that chronic child abuse was a contributing cause of her death. Dr. Pustilnik identified large scars on Anna's buttocks as the result of repeated abusive paddling, and explained that head injuries Anna received more than forty-eight hours before her death had made her scalp soft and spongy from the accumulation of blood in the tissue. He further testified that Anna had blood in her vaginal vault and in the surrounding tissue, including hemorrhaging to her rectal vaginal septum. According to Dr. Pustilnik, these injuries were caused by a blunt object penetrating Anna's vagina or rectum with such force that tissues in these areas and in the area around Anna's bladder hemorrhaged. Dr. Pustilnik thought it likely that these injuries occurred less than an hour before Anna's death, but they could have occurred as long as forty-eight hours before her death.

Finally, Dr. Pustilnik testified that Anna's death was caused by multiple blunt force trauma to her abdominal area. More specifically, he testified that separate blows to her upper abdomen, delivered during the same beating, lacerated her liver and ruptured her duodenum. Although each of these injuries was independently capable of causing death, neither caused death immediately. According to Dr. Pustilnik, Anna did not die from either of these injuries for several hours, and possibly as many as forty-eight hours. During this time, a large amount of blood and fluid accumulated in the soft tissues and cavity of Anna's abdomen. These injuries and their

effects could in turn produce stomach pain, nausea, and vomiting, and eventually produced the shock, hypotension, and/or sepsis that was the mechanism by which death occurred. According to Dr. Pustilnik, there was a chance that Anna might have survived if she had received immediate medical attention.

*Yost*, 222 S.W.3d at 868-70 (footnotes omitted).

Yost pleaded not guilty to the murder charge. The jury found him guilty and sentenced him to life imprisonment. The appellate court affirmed his conviction, rejecting Yost's argument that the evidence at trial was insufficient to support his conviction. *Id.* at 875-77.

In state habeas proceedings, Yost brought claims falling into three categories: claims regarding the prosecution's use of DNA evidence; claims regarding Dr. Pustilnik, the medical examiner who testified for the prosecution; and claims that his counsel had been constitutionally ineffective (Dkt. 24-15, at 11-34). The state habeas court found that, because approximately 11 years had elapsed since Yost's trial, his trial counsel did not have a clear recollection of the proceedings and could not provide an affidavit responding to Yost's habeas claims (Dkt. 24-18, at 98). Jeri Yenne, the Brazoria County District Attorney, provided a responsive affidavit (Dkt. 24-16, at 56-57).

Regarding the DNA evidence, Yost claimed that prosecutors in his case had committed misconduct because the methodology for testing a "DNA mixture," or evidence including DNA from more than one person, had been updated since his trial. Yenne's affidavit stated that she had received notification in 2015, approximately ten years after Yost's conviction, regarding changes in

interpretation of DNA evidence (*id*. at 57). Yenne averred that she had notified Yost and his trial counsel within a reasonable amount of time:

> On August 21, 2015, I received notification of changes in interpreting DNA results from the Texas Forensic Science Commission. It took time to determine the affected cases because we had to review hundreds of DNA reports from multiple agencies over a multiple[-] year time frame. Notices were sent in those cases regarding these changes. On June 1, 2016, notices regarding these changes were sent to the Applicant and trial attorney Jimmy Phillips, Jr.

(*id*. (citation omitted)). The state habeas court recommended denial of relief on Yost's DNA claim, determining that he had "failed to show that differences in the process of interpreting DNA results [were] exculpatory or would have caused a different result at trial" and had failed to show prosecutorial misconduct (Dkt. 24-19, at 2).

Regarding Dr. Pustilnik, Yost claimed that prosecutors had committed misconduct when they failed to inform him that Dr. Pustilnik had been disciplined by a state medical board in 1999 and 2003. Yenne's responsive affidavit stated that she had received information about complaints against Dr. Pustilnik on March 18, 2015—again, approximately ten years after Yost was convicted—and "d[id] not consider [it] to be exculpatory" (Dkt. 24-16, at 56-57). She nevertheless provided the information to Yost's trial and appellate counsel, and later provided it directly to Yost:

> Out of an abundance of caution, I decided to notify the defendants and their counsel of these complaints in the cases involving Dr. Pustilnik. It took a period of time to determine who the affected defendants and counsel were. We had to review autopsies occurring over a twelve[-]year period of time. I then sent notices on these cases.

I sent notices to the Applicant's trial counsel Jimmy Phillips, Jr. and appellate counsel Perry Stevens on June 4, 2015. Soon afterward, the Applicant sent motions regarding Dr. Pustilnik to our office. On June 17, 2015, we forwarded these to trial counsel Jimmy Phillips, Jr. and Brooks Bass; and appellate counsel Perry Stevens. Attorney Perry Stevens returned our notices, stating that he no longer represented the Applicant and would not accept the notices. The Applicant later requested supplementary information regarding the material our office received regarding Dr. Pustilnik. On August 5, 2015 we coordinated with the prison to hand deliver a CD to him containing this information.

(*Id.*) (citations omitted). The state habeas court determined that the 2015 evidence did not demonstrate that Dr. Pustilnik's testimony in Yost's trial was inaccurate and that Yost had not shown that the new information was "exculpatory or would cause a different result at trial" (Dkt. 24-19, at 2).[2] It also found "no evidence of prosecutorial misconduct" because "the State did not receive the claims regarding Dr. Pustilnik until March 18, 2015" and then "timely sent notices" to Yost and his trial counsel (Dkt. 24-18, at 98).

Finally, Yost's state habeas application raised multiple claims that his trial counsel and appellate counsel had been constitutionally ineffective. For example, Yost claimed that counsel had failed to discover and use evidence about the victim, her sister, and other family members; about Yost's employment records; and about family members' cell phone records. The habeas court found that most of Yost's

---

[2] The court further determined that Yost had failed to show that Dr. Pustilnik's trial testimony was inconsistent regarding "the time and cause of the death of the victim" and "the viability of the victim's survival with proper medical care" (Dkt. 24-18, at 97).

ineffective-assistance-of-counsel claims were barred by laches.[3]  Eleven years had

elapsed since Yost's trial, which the court found attributable to Yost (*id*.).  The

court determined that the State was prejudiced by Yost's trial counsel's inability to

remember the "preparation and presentation of the case" (*id*.).  The court therefore

recommended denial of all of Yost's claims that his trial or appellate counsel had

been ineffective.  *See* Dkt. 24-19, at 2 (concluding that Yost "failed to show

ineffective assistance of trial counsel," "failed to show ineffective assistance of

appellate counsel," and "is barred by the principle of laches in his claims that trial

counsel were ineffective").

The Court of Criminal Appeals denied Yost's habeas application on February

15, 2017.  Yost executed his federal petition on February 28, 2017.

## II.  <u>LEGAL STANDARDS</u>

### A.  <u>*Pro Se* Pleadings</u>

Federal courts do not hold *pro se* habeas petitions "to the same stringent

and rigorous standards as . . . pleadings filed by lawyers."  *Hernandez v. Thaler*,

630 F.3d 420, 426 (5th Cir. 2011) (internal quotation marks and citation omitted).

"The filings of a federal habeas petitioner who is proceeding *pro se* are entitled to

---

[3]     The state habeas court also recommended denial of two of Yost's claims on the
merits.  Regarding Yost's claim that his counsel was ineffective for failing to request a
lesser included offense of involuntary manslaughter or criminally negligent homicide, the
habeas court found that counsel was not ineffective "because there was no evidence
presented directly germane to those lesser offenses" (Dkt. 24-18, at 98).  The court also
found no "cumulative error" from Yost's multiple claims regarding counsel's
ineffectiveness (Dkt. 24-19, at 2).

the benefit of liberal construction." *Id.*

### B.   <u>The Anti-Terrorism and Effective Death Penalty Act</u>

This federal petition for habeas corpus relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). *See Woodford v. Garceau*, 538 U.S. 202, 205-08 (2003); *Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997). Under AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Cobb v. Thaler*, 682 F.3d 364, 372-73 (5th Cir. 2012).

Federal courts look to the "last reasoned opinion" as the state court's "decision." *Ylst v. Nunnemaker*, 510 U.S. 797, 803 (1991); *see Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012). "Where a state court's decision is unaccompanied by an explanation," and the lower courts did not issue a reasoned opinion, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *see Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding that there is a rebuttable presumption that the

federal claim was adjudicated on the merits when the state court addresses some claims, but not others, in its opinion).

Review under AEDPA is "highly deferential" to the state court's decision. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  To merit relief under AEDPA, a petitioner may not merely show legal error in the state court's "decision." *White v. Woodall*, 517 U.S. 415, 419 (2014) (stating being "merely wrong" or in "clear error" will not suffice federal relief under AEDPA).  AEDPA review exists only to "guard against extreme malfunctions in the state criminal justice systems." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (internal citation and quotation marks omitted). "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 572 U.S. at 419-20 (quoting *Richter*, 562 U.S. at 103). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this court may grant habeas relief under 28 U.S.C. § 2254(d)(1) only if the state-court decision "was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent.  *See Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005).  Under the "contrary to" clause, this court may afford habeas relief if the state court "reaches a legal

conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Matamoros v. Stephens*, 783 F.3d 212, 215 (5th Cir. 2015) (internal quotation marks and citations omitted). To constitute an "unreasonable application" of clearly established federal law, the state court's determination "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods*, 135 S. Ct. at 1376 (internal citation and quotation marks omitted).

On factual issues, AEDPA precludes federal habeas relief unless the state court's adjudication of the merits was based on an "unreasonable determination of the facts in light of the evidence presented in the state[-]court proceeding." *See* 28 U.S.C. § 2254(d)(2); *Martinez v. Caldwell*, 644 F.3d 238, 241-42 (5th Cir. 2011).

## III. <u>ANALYSIS</u>

Yost's federal petition brings nine claims for relief based on the DNA evidence at his trial, Dr. Pustilnik's testimony, and his prior counsel's alleged ineffectiveness. *See* Dkt. 1, Dkt. 10, Dkt. 11. The respondent's answer argues that Yost's claims regarding DNA evidence and Dr. Pustilnik do not warrant habeas relief and that his remaining claims are time-barred (Dkt. 22).

### A. DNA Evidence (Claim 2)

Yost argues that his due-process rights were violated because the prosecution introduced DNA evidence which has now been "proven unreliable" by updated testing methods (Dkt. 10, at 6). He also argues that the state habeas court unreasonably determined that the updated information was not exculpatory (*id*.).

The Due Process Clause requires the prosecution to disclose material evidence that is favorable to the defense. *Brady v. Maryland*, 373 U.S. 83 (1963). A successful *Brady* claim requires a showing that "the prosecution suppressed evidence," that the suppressed evidence was "favorable to the defense" and "material to either guilt or punishment," and that the evidence "was not discoverable using due diligence." *Prystash v. Davis*, 854 F.3d 830, 837 (5th Cir. 2017).

Prosecutors at Yost's trial introduced "mixed DNA" samples from his residence, where the victim had also lived (Dkt. 11, at 21). Yost states that the samples included blood stains on the victim's shirt, which prosecutors argued "contained DNA of both Yost and the victim" and therefore "connected Yost to the crime, in conjunction with other evidence" (*id*.). He argues that the analysis showed only that the victim "could not be excluded as a contributor" to the blood stain (*id*. at 22), that no blood was found on the victim when paramedics arrived on the scene (*id*. at 21), and that he had "no cuts or blood on him when arrested [three] days later" (*id*.).

Long after his conviction was final, the Texas Forensic Science Commission updated its testing methods. According to Yost, the commission reported that "sample calculations/testing protocols" for mixed DNA samples from more than one person, such as those used in his case, had been "called into question" (Dkt. 10, at 6). He refers to a posting at his TDCJ unit in 2016, which stated that "a common statistical method they used for calculating statistics for mixed DNA

samples may not have always taken into account certain scientific limitations" (Dkt. 11, at 22 (internal quotation marks omitted)). He therefore argues that the DNA evidence in his case "provided extremely low to moderate probability statistics" (Dkt. 10, at 6).[4]

In May 2016, after Yost became aware of the updated testing methods, he sought recalculation of the DNA evidence in his case (Dkt. 11, at 22). He received a letter from Yenne dated June 1, 2016, confirming that the evidence in his case included a DNA mixture and providing instructions on how to request a recalculation. *See* Dkt. 24-18, at 4-5. Yost states that this information "further call[ed] into question the DNA statistical calculation of mixed samples . . . from 1999 until August 2015" (Dkt. 11, at 22). He claims that "the questionable DNA evidence" in his case was presented "in conjunction with other questionable evidence" (*id*. at 23). He does not, however, state specifically how the testing methods actually affected the DNA evidence in his case.

The state habeas court concluded that Yost had failed to show that the evidence regarding updated DNA testing was exculpatory or that he had been prejudiced by the DNA testing methods in his case (Dkt. 24-19, at 2). To warrant federal habeas relief, Yost must show that this determination by the state court was

---

[4]      *See id*. ("DNA results respective to victim, Anna Farmer[,] showed no probability statistic of randomly selecting an unre[la]ted person who could be contributor to the blood samples; comparison with Yost's DNA provided extremely low to moderate probability statistics. The Texas Forensic Science Commission later reported that mixed DNA sample calculations/testing protocols were called into question").

"contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent, or was an "unreasonable determination of the facts in light of the evidence presented in the state[-]court proceeding." *See* 28 U.S.C. § 2254(d). Yost's argument that the DNA evidence in his case was "questionable" or that Texas officials "may not have always taken into account certain scientific limitations" (Dkt. 11, at 22-23) is insufficient to show that he was prejudiced. *See Prystash*, 854 F.3d at 837. He therefore fails to demonstrate that the state court's determination was unreasonable under § 2254(d)'s deferential standards.[5]

### B.     Dr. Pustilnik (Claim 8)

Yost argues that his due-process rights were violated at trial when the prosecutor withheld "exculpatory evidence about prior malfeasance" by Dr.

---

[5]     Additionally, Yost appears to argue that habeas relief is appropriate because, if the DNA evidence against him were disregarded, the remaining evidence would be insufficient to support his conviction. *See* Dkt. 41, at 16-18. When reviewing a sufficiency-of-the-evidence claim, a court affirms a jury's conviction if, considering all of the evidence in a light most favorable to the prosecution, a rational trier of fact could have returned a verdict unfavorable to the defendant. *Jackson v. Va.*, 443 U.S. 307 (1979); *see Cary v. State*, 507 S.W.3d 761, 765 (Tex. Crim. App. 2016) (applying federal *Jackson* standard). On federal habeas review, the stringent *Jackson* standard merges with AEDPA and creates a high barrier to federal habeas relief. S*ee Coleman v. Jackson*, 566 U.S. 650, 651 (2012); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008).

Yost raised the sufficiency-of-the-evidence issue on direct appeal, and the appellate court overruled the issue. The court relied on evidence unrelated to DNA evidence in reaching its conclusion, including the testimony of Yost's family members. *Yost*, 222 S.W.3d at 875-76 (applying legal standard subsequently overruled by *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) ("the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt"). Yost's argument in these proceedings that the DNA evidence was "questionable" does not suffice to show that the state court's determination was contrary to *Jackson* or was otherwise an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254.

Pustilnik, the medical examiner who testified for the prosecution (Dkt. 11, at 45). To succeed on his claim, Yost must show that the prosecution suppressed evidence, that the suppressed evidence was material and favorable to the defense, and that the evidence was not discoverable using due diligence. *See Prystash*, 854 F.3d at 837. The prosecutor's duty to disclose "extends to all evidence known not just to the prosecutors, but 'to the others acting on the government's behalf in the case, including the police.'" *Floyd v. Vannoy*, 894 F.3d 143, 161-62 (5th Cir.), *cert. denied,* 139 S. Ct. 573 (2018) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). Impeachment evidence "is favorable *Brady* evidence." *Id.* at 163; *see U.S. v. Bagley*, 473 U.S. 667 (1985).

Yost's claim relies on discipline imposed on Dr. Pustilnik by the Texas Medical Board for erroneous autopsy findings. He argues that the prosecution committed misconduct at his 2005 trial when it concealed the prior discipline. The state habeas court, relying on Yenne's affidavit, found no prosecutorial misconduct because the prosecution received the information in 2015, years after Yost's trial, and timely notified Yost and his counsel (Dkt. 24-18, at 98). It also determined that Yost had not demonstrated that Dr. Pustilnik's testimony in his case was inaccurate (Dkt. 24-18, at 97-98).

Yost challenges the state habeas court's determination that prosecutors had not learned of the purported misconduct until years after his trial, arguing that knowledge "should be imputed" to the Brazoria County District Attorney's office because other state entities had the information (Dkt. 41, at 19-20). He argues that

the Texas Medical Board and the University of Texas Medical Branch ("UTMB"), who purportedly had the information, "functioned as an investigative member of the prosecution team" (*id.* at 20). He also argues that Yenne's 2016 affidavit in state habeas proceedings obscured facts regarding dates and contents of disclosures regarding Dr. Pustilnik and that, although Yost was *pro se* during state habeas proceedings, Yenne "falsely implied that Yost was represented by counsel" by directing her 2015 disclosure to his previous counsel (Dkt. 10, at 11).

Yost fails to demonstrate that the prosecution "suppressed" evidence in his case, as required for a *Brady* claim, because he cites no authority to support his argument that the institutional knowledge of other state entities should be imputed to the prosecutors at his trial. First, Yost's evidence regarding the other agencies' institutional knowledge pertains to time periods long after his trial. *See*, *e.g.*, Dkt. 41, at 21 (citing to UTMB reports from 2012 and 2013); *id.* at 23-24 (citing to news articles from 2018). Additionally, case authorities hold only that prosecutors must disclose evidence known to "others acting on the government's behalf in the case," typically police officers. *Floyd*, 894 F.3d at 161-62.[6] Yost presents no evidence that the agencies he identifies were acting on the prosecution's behalf in his case. To the contrary, the evidence in the record shows, and the state habeas court found, that the prosecutors in his case did not receive

---

[6]     *See Pitonyak v. Stephens*, 732 F.3d 525, 533 (5th Cir. 2013) (holding in federal habeas proceedings that a state court's determination that *Brady* protections did not extend to a "mental health professional" who was "not involved in investigating or preparing the case" was "not unreasonable").

the information regarding Dr. Pustilnik until 2015. Moreover, Yost presents no specific facts or argument to refute the state habeas court's determination that he had failed to show that Dr. Pustilnik's testimony at his trial was inaccurate. The state habeas court's denial of Yost's claim was not contrary to, or an unreasonable application of, *Brady*, *Kyles*, or other clearly established law. His claim therefore fails under § 2254(d).

### C.    Statute of Limitations (Claims 1, 3-7, and 9)

Respondent argues that Claims 1, 3, 4, 5, 6, 7, and 9 are time-barred by more than eight years.[7] In Claim 1, Yost asserts that Dr. Pustilnik's testimony violated his rights under the Confrontation Clause and the Due Process Clause because Dr. Pustilnik "subtly inserted [a] supplemental report into [the] original autopsy report a few days before trial, then testified based on the supplemental report, that [the] victim's fatal injuries occurred less than 48 hours before [her] death" (Dkt. 10, at 6). In Claim 9, he claims that his due-process rights were violated at trial because the trial court and his counsel denied and "evaded" his requests for an expert and because two judges denied his motions for recusal (*id*. at 12). Yost's remaining claims assert that his trial and appellate counsel were constitutionally ineffective.

Under 28 U.S.C. § 2244(d)(1), a one-year statute of limitations applies to Yost's petition. This one-year period runs from the "latest of" four accrual dates:

---

[7]    *See In re Young*, 789 F.3d 518, 528 n. 3 (5th Cir. 2015) ("[t]hough we do not decide that issue today, it appears that applying the statute of limitations to each claim [rather than to an entire petition] is consistent with AEDPA and the precedent of other circuits").

(A)     the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)     the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Yost's conviction was affirmed on April 24, 2007. After the Texas Court of Criminal Appeals granted him an extension of time to seek discretionary review, his time to file his petition expired on Monday, July 23, 2007. *See* Dkt. 23-8. Under Section 2244(d)(1)(A), "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review" therefore was July 23, 2007, and the one-year limitations period expired on Wednesday, July 23, 2008. Yost's federal petition, executed on February 28, 2017, is more than eight years late and time-barred unless a later accrual date applies.

The time period during which a "properly filed application for State post-conviction or other collateral review" is pending is not counted toward the limitation period. 28 U.S.C. § 2244(d)(2). However, Yost's state habeas application was executed on July 12, 2016, after his limitations period under the

AEDPA had already expired. Statutory tolling therefore does not render the current federal petition timely. *See Richards v. Thaler*, 710 F.3d 573, 576 (5th Cir. 2013).

Yost does not assert that a state-created impediment to his habeas application was recently removed, *see* § 2244(d)(1)(B), or a constitutional right newly recognized and made retroactive by the Supreme Court, *see* § 2244(d)(1)(C). However, he argues that his petition is timely under § 2244(d)(1)(D) because he discovered the "factual predicate" for his claims on August 5, 2015, when the Brazoria County District Attorney provided him with complaints in other criminal cases against Dr. Pustilnik (Dkt. 1, at 13; Dkt. 10, at 14). He maintains that all claims in his petition are predicated on the allegedly suppressed evidence regarding Dr. Pustilnik.[8]

Yost's assertions that all of his claims are predicated on the evidence regarding Dr. Pustilnik are cursory and unsupported by the record. Moreover, as held above, his *Brady* claim regarding Dr. Pustilnik lacks merit because he has not shown that prosecutors suppressed the evidence in question or that the evidence was material. Therefore, to the extent Yost argues that other claims were

---

[8]   *See* Dkt. 11, at 13 (arguing that his ineffective-assistance-of-counsel claims are "inter-connected to the recently discovered [*Brady*] claims, due to the conspiracy between trial counsel, the district attorney, and the trial and pre-trial judges, to deny Yost the basic tools of defense including experts, discovery, and investigation"); *id.* at 27 (arguing that the appellate court relied "heavily" on Pustilnik when affirming his conviction); Dkt. 41, at 7 (arguing that the impeachment evidence regarding Dr. Pustilnik has an "inextricable relationship and connection" with "all of his other habeas claims and his *Brady* claims" and that "most every other piece of other evidence offered against Yost . . . was vitally inter-dependent on the testimony" of Dr. Pustilnik).

unavailable until he received the evidence about Dr. Pustilnik, he fails to sufficiently establish a "factual predicate" for those claims under § 2254(d)(1)(D).

Finally, Yost argues that he is entitled to equitable tolling of the limitations period. Equitable tolling is available in rare and exceptional circumstances. *Mathis v. Thaler*, 616 F.3d 461, 475 (5th Cir. 2010). It requires a showing that a petitioner has been pursuing his rights diligently and that "some extraordinary circumstance" prevented the timely filing of his habeas petition. *See Holland v. Florida*, 560 U.S. 631, 649 (2010); *Pace v. DiGuglielmo*, 544 U.S. 408, 419 (2005). In support of his request for equitable tolling, Yost again relies on the 2015 disclosure of Dr. Pustilnik's past discipline. As held above, he has not sufficiently demonstrated that his other claims were so connected to the impeachment information regarding Dr. Pustilnik that he was prevented from filing a timely federal petition to pursue relief on his ineffective-assistance-of-counsel claims. *See Holland*, 560 U.S. at 649. Yost therefore makes no showing that equitable tolling is warranted in his case.

Yost's remaining claims therefore must be dismissed as untimely filed.

## IV. **CERTIFICATE OF APPEALABILITY**

Habeas corpus actions under 28 U.S.C. § 2254 or § 2255 require a certificate of appealability to proceed on appeal. 28 U.S.C. § 2253(c)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner.

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "'that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Tennard*, 542 U.S. at 282 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (internal citation and quotation marks omitted). Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). After careful review of the record and the applicable law, the court concludes that reasonable jurists would not find its assessment of the claims debatable or wrong. Because the petitioner does not allege facts showing that his claims could be resolved in a different manner, a certificate of appealability will not issue in this case.

## V. CONCLUSION

For the reasons stated above the court **ORDERS** that:

1.     The petition for a writ of habeas corpus filed by James Kevin Yost is **DISMISSED**.

2.     A certificate of appealability is **DENIED**.

The Clerk will provide a copy of this order to the parties.

Signed on Galveston Island this ___23rd___ day of _____March_____, 2020.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE